# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-3709

_____

United States of America

*Plaintiff - Appellee*

v.

Beau Brandon Croghan

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Council Bluffs

_____

Submitted: May 14, 2020
Filed: August 28, 2020

_____

Before SMITH, Chief Judge, MELLOY and SHEPHERD, Circuit Judges.

_____

SMITH, Chief Judge.

A jury convicted Beau Brandon Croghan of receipt or attempted receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2). The district court[1]

_____

[1]The Honorable Stephanie M. Rose, United States District Judge for the Southern District of Iowa.

sentenced Croghan to a below-Guidelines sentence of 110 months' imprisonment. On appeal, Croghan challenges the district court's admission of certain evidence, the sufficiency of the evidence, and his sentence. We affirm.

## I. *Background*[2]

### A. *The Tor Network*

Croghan's offense occurred using the Tor network.[3] The Tor network is "a network that runs on top of the regular Internet" and operates as "a series of different computers that are all around the world." Trial Tr., Vol. I, at 41, *United States v. Croghan*, No. 1:15-cr-00048-SMR-HCA-1 (S.D. Iowa Aug. 20, 2018), ECF No. 127. When a user connects to a website through the Tor network, the user's Internet Protocol (IP) connection is bounced through multiple computers. The user's IP address appears as the last computer funneled through the series of interconnected computers. A user must download special software and install the Tor browser on his or her computer to access the Tor network. Once the user downloads the software, he or she "can use the Tor network to access websites without revealing to those websites where [the user] actually [is]." *Id.* at 43. The user's IP address is unavailable, and the user remains anonymous.

"[T]he Tor network [also] has a feature which is known as Tor hidden services." *Id.* at 44. This feature allows the user to host a website with the same anonymity by protecting the website administrator's IP address. The website's physical location is unknown. In addition, Tor hidden services also allow the users who are accessing the website's location to be hidden. As a result, these users are

---

[2]"We recite the facts in the light most favorable to the jury's verdict." *United States v. Galloway*, 917 F.3d 631, 632 (8th Cir. 2019) (internal quotation omitted).

[3]"Tor" stands for "[t]he Onion Router." *United States v. Horton*, 863 F.3d 1041, 1045 (8th Cir. 2017).

"able to communicate with each other through the Tor network without ever revealing to each other where the other is in the real world." *Id.* at 45.

"Tor hidden services are very heavily utilized for all types of criminal activity." *Id.* at 50. For example, "Tor hidden services [are used] to create child pornography websites." *Id.* With Tor hidden services, the uniform resource locator used to access a website is "16 randomly generated letters and numbers." *Id.* at 46. "Within the Tor network, a user generally has to know the 16-digit or character string for a hidden service that [he or she] want[s] to access." *Id.* at 48–49.

B. *Playpen*

In August 2014, the FBI became aware of a Tor hidden service website called Playpen and began monitoring it. "Playpen was a message board-type website where people would distribute and share images and videos of child pornography." *Id.* at 51. Playpen "had hundreds of thousands of members" with "tens of thousands of images and videos of child pornography being shared and distributed." *Id.* at 52.

FBI Special Agent Daniel Alfin ("SA Alfin") was one of the agents charged with monitoring Playpen from August to December 2014. SA Alfin set up user accounts on Playpen to surveil the activity on the website. He testified that a user needed to install the Tor browser, navigate to Playpen via the 16-digit random code, and register a user account with Playpen. A user registered with Playpen by entering an e-mail address, user name, and password. Playpen encouraged anonymity by warning new users to use a fake e-mail address during the registration process. Once logged in, the user was taken to the website's index page "contain[ing] links to all of the different parts of the Playpen website, and those links were all broken down by categories like boys, girls, toddlers, incest, [etc.]" *Id.* at 59. The user then clicked on one of the categories displayed on the index page and was taken to the category's subforum. The subforum contained a listing of different postings that Playpen's members had created. Each of the "postings . . . ha[d] titles indicative of the types of

-3-

images or videos that that user was sharing." *Id.* of 65. After clicking on one of the topics, the user "would enter that actual posting, and at that point typically . . . would see images of child pornography on [his or her] computer screen and links to download full videos." *Id.* SA Alfin testified that "[w]hen the image is displayed on [the user's] computer screen, that means it's been downloaded to [the user's] computer over the Internet, and now it's there on [the user's] computer screen for [the user] to see." *Id.* at 66. SA Alfin confirmed that when the image appears on the user's computer screen, the user has "received whatever image [the user] clicked on." *Id.* In summary, SA Alfin explained, the child-pornography

> images were embedded within [the] post so when the user clicked on
> that particular post, these full-sized images were within that post and
> would have been downloaded to [the user's] computer and displayed on
> the computer screen without additional action being taken. The action
> to view the images was clicking on [the] post.

Trial Tr., Vol. II, at 111, *United States v. Croghan*, No. 1:15-cr-00048-SMR-HCA-1 (S.D. Iowa Aug. 21, 2018 ), ECF No. 128. The computer downloaded the file to the temporary storage of the user's computer, and the image displayed on the computer.

In December 2014, Playpen's administrator misconfigured the website. As a result, when the user entered a valid e-mail address, the user received a confirmation e-mail sent over the regular Internet, not the Tor network. The confirmation e-mail showed the actual IP address for Playpen. The FBI identified Playpen's administrator and arrested him. Following the administrator's arrest, the FBI assumed administrative control of Playpen via a court order. The FBI continued operating the website in an attempt to identify Playpen's users.

The FBI administered Playpen from February 20, 2015, to March 4, 2015—a period of 13 days. The FBI obtained a search warrant authorizing a search of Playpen users' computers through the use of a Network Investigative Technique (NIT). The

NIT sent a hidden computer code to Playpen users' computers that instructed the computers to transfer identifying information back to an FBI computer over the regular Internet. This identifying information included the IP address, operating system information, operating system username, and Media Access Control (MAC) address of the user's computer.

## C. *Croghan's Conduct*

During the 13-day period, the FBI successfully identified a user in Council Bluffs, Iowa. The user was "Beau2358." The e-mail address associated with Beau2358 was cbbarscene@gmail.com, and Beau2358's password for the Playpen account was gargoyle62. Beau2358 registered with Playpen on September 27, 2014. Beau2358 logged in to Playpen on four dates during the FBI's 13-day operation: February 20, 2015; March 1, 2015; March 3, 2015; and March 4, 2015. Beau2358 was actively logged in to Playpen for over 13 hours between September 27, 2014, and March 4, 2015. Beau2358 accessed 51 topics with over 600 images of child pornography while the NIT was active.

Through the NIT, the FBI "obtained the real IP address that Beau2358 was using to access the Playpen website." Trial Tr., Vol. I, at 77–78. The IP address associated with this user was 68.227.166.242 and was operated by Cox Communications. The IP address was registered to Croghan at his residence in Council Bluffs, Iowa. The host name for the computer was "Beaus." The MAC address[4] for the computer used to access Playpen was the 12-character unique address, 24FD523B41C0. SA Alfin confirmed that the MAC address from the NIT

---

[4]"All . . . network adapters have a unique identifier associated with them called a MAC address, and those are 12 digits long, and they are unique to a particular device." *Id.* at 75. Each computer has "a network adapter with a MAC address. It's not going to match the MAC address in . . . any other computer . . . . It's unique." *Id.* As a result, "a MAC address can identify a particular computer within someone's home." *Id.* at 74.

matched the Toshiba laptop computer seized from Croghan's residence on July 21, 2015.

SA Alfin confirmed that Beau2358 "accessed" or "looked at" several different sections of Playpen: Preteen HardCore, Infants and Toddlers, Incest, and Jail Bait. Trial Tr., Vol. II, at 121. SA Alfin testified that, for example, "Beau2358 went into the Pre-teen hard core section" and "clicked on a topic."[5] *Id.* at 113. SA Alfin confirmed that Beau2358 "received . . . child pornography" once he "click[ed] on to the next screen" where the "first image c[ame] up or a group of images." *Id.* "[A]ll of the images in the posting [were] downloaded to [Beau2358's] computer over the Internet." *Id.* at 114; *see also id.* at 142 (confirming that once a user "click[s] on an image and view[s] it, [the user has] received it," "whether or not [the user] save[s] a copy to look at later"). These images "depict[ed] prepubescent children engaged in sexual activity." *Id.* at 114.

Special Agent Jacob Foiles ("SA Foiles") was assigned as the case agent for Beau2358. SA Foiles had to verify that "the subscriber, Beau Croghan, still reside[d] at [the Council Bluffs] address." *Id.* at 150. SA Foiles conducted "basic database checks, employment checks, driver's license checks," and "limited surveillance" and learned that Croghan and his wife still resided at the address provided by Cox Communications. *Id.* During the surveillance, SA Foiles located a wireless network that was password protected and associated with Croghan's residence and the Cox Communications subscriber subpoena.

SA Foiles also conducted an open-source internet search on Beau2358 and discovered that a user account on PrimeJailbait.com matched the user name from Playpen. Beau2358 had uploaded five images on PrimeJailbait.com. The open-source

---

[5]"[P]re-teen means prepubescent children, and hard core means some type of penetrative sexual activity." *Id.* at 113.

internet search also uncovered "a blog posting that was reportedly authored by a Beau Croghan." *Id.* at 151. In that blog post, the author mentioned that he was interested in computers, interested in web development, and had three children. SA Foiles also subpoenaed Google for the e-mail address cbbarscene@gmail.com and learned that the e-mail account had a recovery e-mail address of Beau2358@gmail.com. SA Foiles conducted open-source internet searches for cbbarscene and found Facebook pages, a LinkedIn page, and YouTube videos related to cbbarscene.

In addition, SA Foiles received employment information, including Croghan's social security card ending in 2358. These digits matched the last four numbers of the Playpen user Beau2358. SA Foiles also obtained Croghan's work history and confirmed that Croghan was not at work during any of the times that Beau2358 accessed the Playpen network during the 13-day period.

Law enforcement executed a search warrant at Croghan's residence on July 21, 2015. In the master bedroom, law enforcement found a Toshiba laptop on a computer desk. SA Foiles identified items on the computer desk indicating that Croghan was "a computer savvy individual." *Id.* at 166. First, SA Foiles found a computer fan that was either removed or purchased. Second, he discovered four internal hard drives typically found inside of a laptop or desktop computer. He noted that "the average user [does not] typically remove[] those or know[] how to remove those from a computer." *Id.* at 167. Third, SA Foiles found a Linux operating system, which, "generally speaking," "more technologically savvy individual[s]" use. *Id.*

Programs running on a computer store data in random access memory (RAM). A computer's RAM is "a small portion of storage that is used to hold information in an effort to speed up the user's performance on that computer." *Id.* at 204. "RAM is considered volatile, which means if it loses power, then it will be flushed, and there will be no data there." *Id.* At the time of the search warrant, the Toshiba laptop was on; the desktop displayed a folder and shortcut for, among other things, the Tor

browser. Because the laptop was on, FBI Computer Forensic Examiner Jordan Warnock was able to retrieve the computer's RAM data through a forensic procedure and save that data.

Trooper Scott Haugaard of the Nebraska State Patrol, an investigator specializing in computer forensics, forensically examined an exact copy of Croghan's hard drive and "RAM dump." *Id.* at 207. Based on his examination, Trooper Haugaard was able to identify characteristics of the Toshiba laptop. He identified the MAC address and host name associated with the Toshiba laptop as being the same one that the FBI obtained with the NIT and provided to him. Trooper Haugaard conducted a keyword search for Beau2358 and found that the keyword was "used hundreds of times over and over again." *Id.* at 238. Additionally, he conducted a keyword search for gargoyle62—Beau2358's password on Playpen—and discovered that it was also the password for a flight simulator game linked to the Gmail account Beau2358@gmail.com.

Trooper Haugaard's forensic exam revealed that the Tor network was last accessed on the Toshiba laptop on July 19, 2015. A VideoLAN Controller (VLC) was downloaded on Croghan's hard drive. A VLC is a third-party program downloadable from the Internet that plays videos without discriminating against file extensions. Once someone downloads a VLC, "it create[s] . . . subfiles in the computer that track the activity of the VLC." *Id.* at 244. The VLC creates a log of its recent history. According to Trooper Haugaard, Croghan's recent history included the video file name "Baby . . . 0yo suck penis.avi." *Id.* at 247–48. Trooper Haugaard was unable to find this video or locate any other child pornography on the Toshiba laptop. He explained that what he found was "a history of a video that was loaded into the VLC program." *Id.* at 248. Trooper Haugaard also identified a Windows media video file name with the keywords "pthc" ("preteen hard core") and "opva" ("prepubescent child"). *Id.* And, he identified a video file named "6yrsgrl1.avi," which stood for "6-year-old girl." *Id.* at 249. In addition to these recent video file names, Trooper

-8-

Haugaard located a "bookmark" or "quick reference guide" in the computer's browser under the Beau user name for a Russian website containing child exploitation material and adult pornography. *Id.* at 251.

Trooper Haugaard was not surprised that he did not find any child pornography on Croghan's Toshiba laptop. In his experience, "people who use Tor or networks like Tor want to be anonymous." *Id.* at 262. While Trooper Haugaard did not locate any child pornography on the computer, he did locate "some child pornography artifacts" through, for example, the VLC. *Id.* at 276.

## D. *Procedural History*

Croghan was charged in a one-count indictment with accessing and attempting to access child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). Croghan moved to suppress evidence obtained through a warrant authorizing the search of his Toshiba laptop through the use of the NIT. The district court suppressed the evidence, and we reversed. *See Horton*, 863 F.3d at 1052. Following remand, the grand jury returned a superseding indictment, charging Croghan with accessing and attempting to access child pornography ("access count") and receipt and attempted receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2) ("receipt count").

At trial, the district court instructed the jury to deliberate on the receipt count first and to only consider the access count if it could not reach a verdict on the receipt count or found Croghan not guilty of the receipt count. The district court's instruction was based on its conclusion that the access count was a lesser included offense of the receipt count.

The jury found Croghan guilty of the receipt count. Croghan moved for judgment of acquittal, which the district court denied. The district court sentenced Croghan to 110 months' imprisonment, a sentence 25 months below the advisory Guidelines range of 135 to 168 months' imprisonment.

## II. *Discussion*

Croghan raises three issues on appeal. First, he argues that the district court erred at trial by admitting certain evidence. Second, he asserts that the district court erroneously denied his motion for judgment of acquittal on the receipt count because no evidence exists that he "took custody of child pornography." Appellant's Br. at 13. Finally, he maintains that the district court abused its discretion in sentencing him because it punished him for exercising his constitutional right to a jury trial.

### A. *Admission of Evidence*

Croghan alleges that the district court committed three evidentiary errors. First, he argues that the district court erred by admitting images of a relative that he had uploaded to PrimeJailBait.com. Second, he argues that the district court erred by permitting SA Foiles to testify that, upon learning Croghan had children, SA Foiles was "concern[ed] . . . 'because [the FBI's] primary objective . . . is trying to rescue victims of sexual abuse.'" *Id.* at 8 (third alteration in original) (quoting Trial Tr., Vol. II, at 152). Third, he argues that the district court erred by permitting SA Foiles to testify about the execution of the no-knock search warrant on his residence.

### 1. *Images of Relative*

At trial, SA Foiles testified that he conducted an open-source internet search on Beau2358 to confirm Croghan's identity and discovered that a user account on PrimeJailbait.com matched the user name from Playpen. Beau2358 had uploaded five images of what appeared to be a 14- or 15-year-old female on PrimeJailbait.com. SA Foiles explained that PrimeJailbat.com "was a website that had legal pictures of clothed . . . people, but they were generally minors, younger than 18." Trial Tr., Vol. II, at 151. On direct examination, the government showed SA Foiles Exhibit 15—the pictures posted on PrimeJailbait.com. After SA Foiles authenticated the exhibit, the government offered Exhibit 15 into evidence. Croghan did not object to its admission. SA Foiles then testified that the FBI identified the female in the pictures as one of Croghan's relatives. Croghan's counsel also did not object to this testimony.

Croghan's relative who appeared in the pictures also testified. She confirmed that Exhibit 15 contained pictures of her found on PrimeJailbait.com. She testified that she did not post the pictures; in fact, she had "never heard of the website." *Id.* at 221. According to Croghan's relative, she posted those pictures to her private Facebook account. She knew that Croghan had seen "Picture No. 3" because he had commented on the picture. *Id.* at 222. She testified that she found out that her pictures were posted to PrimeJailbait.com three years before trial. When asked how the posting made her feel, Croghan's relative responded, "Very uncomfortable and kind of scared for my life." *Id.* After her response, Croghan's counsel objected to this question based on relevance, and the district court overruled the objection. Croghan's relative then explained that she was "uncomfortable and scared" "[b]ecause [she] had posted these photos for [her] family to see but not for sickos out there to see." *Id.* Croghan's counsel did not cross-examine Croghan's relative.

On appeal, Croghan argues that the district court erroneously permitted "the government to elicit testimony from SA Foiles and . . . Croghan's female relative suggesting that [he] uploaded images of the relative to PrimeJailBait.com." Appellant's Br. at 14. He also asserts that the district court erroneously admitted Exhibit 15—the pictures of the female relative posted on PrimeJailBait.com. He notes that while he "unsuccessfully objected to the female relative's testimony that the ordeal made her very uncomfortable and scared for her life," he failed to "object to the evidence regarding PrimeJailBait.com." *Id.* He concedes that "this [c]ourt reviews for plain error." *Id.*

"The plain error test requires an (1) error, (2) that is plain, and (3) that affects substantial rights. The error may only be remedied if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Zurheide*, 959 F.3d 919, 921 (8th Cir. 2020) (cleaned up).

-11-

Croghan maintains that the district court violated Federal Rule of Evidence 404(b)(1) by admitting the PrimeJailBait.com evidence. According to Croghan, "[t]he PrimeJailBait.com images were not pornographic, erotic, or connected in any way to the charged offenses." Appellant's Br. at 15. He maintains that "[t]he government offered the evidence to establish that [he] had a propensity for trafficking images of children, which is precisely what Rule 404(b)(1) was designed to prevent." *Id.* Alternatively, Croghan argues that the district court should have excluded the PrimeJailBait.com evidence under Federal Rule of Evidence 403 as substantially more prejudicial than probative. Croghan asserts that the evidence did not assist the jury in answering "whether [he] received or accessed child pornography through Playpen"; instead, the evidence "tended to show that [he] reposted photographs of a young relative on a despicable (but evidently lawful) website." *Id.* at 17.

"We will reverse the district court's 404(b) ruling only if the evidence clearly has no bearing on the case." *United States v. Fechner*, 952 F.3d 954, 961 (8th Cir. 2020). Rule 404(b)(1) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, Rule 404(b)(2) states that "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." "Rule 404(b) is thus a rule of inclusion rather than exclusion and admits evidence of other crimes or acts relevant to any issue in the trial, unless it tends to prove only criminal disposition." *United States v. Heidebur*, 122 F.3d 577, 579 (8th Cir. 1997) (internal quotation omitted). This means that "evidence of prior bad acts that is probative of the crime charged is not excluded under Rule 404(b)." *Id.* (internal quotation omitted). Rule 404(b) does not exclude other-acts evidence if such evidence is:

> (1) relevant to a material issue raised at trial; (2) similar in kind and close in time to the crime charged; (3) supported by sufficient evidence

to support a jury finding that the defendant committed the other act; and (4) its probative value is not substantially outweighed by its prejudicial value.

*Id.* at 580.

We recently addressed whether a district court erroneously admitted child erotica images in a defendant's trial for transportation of child pornography and receipt of child pornography. *Fechner*, 952 F.3d at 960. In that case, "[a] forensic examination of [the defendant's] devices showed extensive child pornography downloads and searches, with over 100 items being moved to an SD card in his phone and later deleted." *Id.* at 957. At trial on the transportation and receipt charges, "[t]he government . . . introduced images of young girls and women found on [the defendant's] SD card that the district court described as child erotica." *Id.* at 958. In doing so, "[t]he government asserted that these images were relevant to show [the defendant's] sexual interest in children and, based on their presence on the SD card, his knowledge of child pornography also located on the SD card." *Id.* The defendant moved to exclude the images. *Id.* The district court denied the motion. *Id.* It "recognized that the possession of the child erotica was not illegal but determined that the evidence was probative to issues of knowledge, motive, and sexual interest in children and was not unduly prejudicial." *Id.*

On appeal, the defendant argued that the district court erroneously admitted the child erotica images because they "were improper propensity evidence used only to establish that he acted in accordance with his alleged character." *Id.* at 960. We held that the child erotica images were admissible under Rule 404(b). *Id.* at 962. We explained that "[t]he child erotica images [were] . . . relevant to establish a motive for possessing child pornography and rebut claims of accident or mistake." *Id.* at 961 (citing *United States v. Vosburgh*, 602 F.3d 512, 538 (3d Cir. 2010) (finding the possession of child erotica suggested that the defendant "harbored a sexual interest

in children, and tended to disprove any argument that he unknowingly" or accidentally possessed child pornography images); *United States v. Hansel*, 524 F.3d 841, 846 (8th Cir. 2008) (finding possession of child erotica, as part of the totality of the circumstances, can establish probable cause that defendant had child pornography on his computer)).

We next rejected the defendant's argument "that the potential prejudice and the jury's likelihood to misuse propensity evidence outweigh[ed] any probative value." *Id.* We examined two prior cases in which we held that pornographic stories were inadmissible under Rule 404(b) in defendants' prosecutions for possession of child pornography. *Id.* (citing *United States v. Evans*, 802 F.3d 942, 946–47 (8th Cir. 2015) (holding that the district court properly denied the government's motion "to introduce stories found on [the defendant's] media devices about adult men engaging in sexual acts with minors" in highly organized files because the evidence by itself did not rebut the defendant's argument that a virus placed the files on his computer); *United States v. Johnson*, 439 F.3d 884, 885 (8th Cir. 2006) (holding "two fictionalized accounts . . . detailing the abduction and forcible rape of a thirteen-year-old girl and the incestuous rape of a fifteen-year-old girl" found under the defendant's bed were admitted to demonstrate his interest in and predisposition to possess child pornography and did not aid in determining if the defendant inadvertently downloaded child pornography, as he claimed)). We distinguished *Johnson* and *Evans*, explaining that the pornographic stories in those cases "were offered solely to establish an interest in young children. No other possibility existed for their usefulness at trial." *Id.* at 962. By contrast, the child erotica images were "locat[ed] in the same place where deleted child pornography hash values were found, and evidence that child erotica had to be manually moved to the SD card, was relevant to the jury's determination of whether [the defendant] knowingly possessed child pornography." *Id.*

Alternatively, we held that

> [e]ven if there was error in admitting the child erotica images, it was harmless. While the content of the child erotica may suggest a sexual interest in children, that is not the sole purpose of the evidence. The jury saw only one image and the content of the images was not discussed at length.

*Id.* (citing *Evans*, 802 F.3d at 949 (finding the admission of propensity evidence harmless where the jury did not hear the content of the pornographic stories and "ample properly-admitted evidence" limited the stories' likelihood of influencing the jury's verdict)).

We hold that the district court did not plainly err in admitting the PrimeJailBait.com evidence. As in *Fechner*, where the child erotica images were admitted to prove motive and rebut claims of accident or mistake, the pictures of Croghan's relative on PrimeJailBait.com and testimony concerning those pictures were offered for the permissible purpose of proving Croghan's identity as Beau2358. The PrimeJailBait.com evidence was relevant because it confirmed that Croghan was Beau2358: he used Beau2358 not only on PrimeJailBait.com to post pictures from his relative's private Facebook account, but also as his user name on Playpen. And, similar to the PrimeJailBait.com website, Croghan—as Beau2358—looked at a section of Playpen entitled "Jail Bait."

"Even if there was error in admitting the [PrimeJailBait.com evidence], it was harmless." *See id.* The evidence's "sole purpose" was not to "suggest a sexual interest in children." *Id.* Furthermore, SA Foiles acknowledged that PrimeJailBait.com "was a website that had *legal* pictures of . . . clothed people" who "were generally minors, younger than 18." Trial Tr., Vol. II, at 151 (emphasis added). And, SA Foiles did not discuss the "content of the images," *see Fechner*, 952 F.3d at 962, other than saying that they "appeared to be of a female around 14, 15" years of age and that the female

was identified as one of Croghan's relatives. Trial Tr., Vol. II, at 151. Likewise, Croghan's relative provided only general details about the pictures. She testified that they were taken at her "Halloween-themed birthday party" when she turned 16 years old. *Id.* at 220. Her central testimony was that she had posted the pictures only to her private Facebook account (that Croghan had access to) and not to PrimeJailBait.com. The admission of her testimony that the posting made her "[v]ery uncomfortable and kind of scared for [her] life," *id.* at 222, was harmless in light of the "ample properly-admitted evidence that [Croghan] knowingly [received] child pornography." *Evans*, 802 F.3d at 949; *see infra* Part II.B.

### 2. *Testimony about Croghan's Children*

When SA Foiles was conducting the open-source internet search on Beau2358, he discovered "a blog posting that was reportedly authored by a Beau Croghan." Trial Tr., Vol. II, at 151. In that blog post, Croghan mentioned that he had three children. SA Foiles testified that learning Croghan had three children was concerning "because [the FBI's] primary objective with all this is trying to rescue victims of sexual abuse. And so the first thing we want to look for is actually hands-on offenders, those that are sexually abusing children, and then possibly producing images from that sexual abuse." *Id.* at 152. Croghan's counsel did not object. Croghan's failure to object to SA Foiles's testimony means that our review is for plain error only. *See Zurheide*, 959 F.3d at 921.

Croghan argues that the district court should have struck SA Foiles's testimony as "irrelevant and unfairly prejudicial." Appellant's Br. at 18 (citing Fed. R. Evid. 402, 403). Croghan contends that "SA Foiles['s] concern for rescuing child victims of sexual abuse . . . had nothing to do with [his] case" because no evidence existed that he "sexually abused children or produced child pornography, or that his children were in any particular danger." *Id.* at 18–19. Croghan maintains that the testimony was prejudicial because it "implied that there was tangible cause for concern for [his] children" and "was likely to arouse the passions of the jury." *Id.* at 19.

-16-

We hold that the district court did not plainly err by not striking SA Foiles's testimony. SA Foiles's testimony concerned *how* the FBI identified Croghan as Beau2358. One of the identifiers was that Croghan had a blog, which stated that he had three children. SA Foiles never testified that he suspected Croghan of sexually abusing his children. Instead, he testified that the primary objective throughout the investigation was "to rescue victims of sexual abuse." Trial Tr., Vol. II, at 152. The first step to accomplish this primary objective is "to look for . . . hands-on offenders, those that are sexually abusing children, and then possibly producing images from that sexual abuse." *Id.* Read in context, SA Foiles was explaining the steps he took as part of his investigation and why he took those steps. His testimony briefly mentioned Croghan's children and did not suggest that Croghan had sexually abused them.

### 3. *Testimony Concerning No-Knock Warrant*

During his opening argument, Croghan's counsel discussed the manner in which law enforcement executed the no-knock search warrant on Croghan's residence. Counsel stated, "On the morning of July 21st, 2015, a group of police officers dressed essentially like SWAT teams broke into the Croghan house at 6:30 a.m., smashed the door open, and they were able to seize a Toshiba laptop, small Toshiba laptop computer." Trial Tr., Vol. I, at 30.

During the direct examination of SA Foiles, the government asked why he requested a no-knock search warrant. Croghan's counsel did not object to this question. SA Foiles testified that the no-knock search warrant was requested "because users accessing Playpen . . . were deemed sort of a higher level of sophistication with regards to technology." Trial Tr., Vol. II, at 159. He also cited "a high likelihood that [Croghan] was likely knowledgeable and possibly employing things like encryption" given his "interest[] in computers." *Id.* As a result, SA Foiles testified, law enforcement "obtained this no-knock search warrant so that [law enforcement did not] give the potential occupant of the house time to destroy evidence." *Id.* at 159–60.

-17-

On cross-examination, Croghan's counsel questioned SA Foiles about how law enforcement executes a no-knock search warrant. SA Foiles confirmed that there are "at least ten officers" who are armed and wearing ballistic vests. *Id.* at 188. During execution of the no-knock warrant on Croghan's home, the officers had handguns displayed. He also confirmed that law enforcement generally gains entry to the home by "tak[ing] a battering ram and break[ing] the door open"; then, officers wake people up, if necessary, and cuff them until the house is secured. *Id.* at 188–89. SA Foiles characterized execution of the no-knock warrant as "a little bit traumatic" on the occupants of the home. *Id.* at 190.

Croghan argues that the district court erred by allowing SA Foiles's testimony about the no-knock search warrant to suggest that Croghan posed a risk to obstruct justice by destroying evidence. He maintains that the testimony was irrelevant because the type of warrant that the FBI obtained "had no bearing on whether [he] was guilty of the charged offenses. Relatedly, the FBI's opinion regarding the risk that [he] may have tried to destroy evidence if given the opportunity was irrelevant to any material issue." Appellant's Br. at 19–20. According to Croghan, SA Foiles's testimony "left the jury with the unfairly prejudicial impression that [he] was a dangerous individual with poor character for trustworthiness." *Id.* at 20. Because Croghan failed to object to the government's question asking SA Foiles why he requested a no-knock warrant, our review is for plain error. *See Zurheide*, 959 F.3d at 921.[6]

---

[6]Croghan asserts that we review the admission of SA Foiles's testimony for an abuse of discretion. Appellant's Br. at 19 (citing *United States v. Lupino*, 301 F.3d 642, 645–47 (8th Cir. 2002)). But the record shows that Croghan did not object to the government's question asking SA Foiles why he requested a no-knock warrant. He lodged two objections to SA Foiles's testimony *prior to* this question: first, he objected to one portion of SA Foiles's testimony as "beyond the scope of the question," and, second, he objected to another portion of SA Foiles's testimony as not relevant to a "question before him right now so it's not relevant." Trial Tr., Vol. II, at 158. At no time did Croghan lodge an objection to the question or testimony

"Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. The threshold for relevance is quite minimal." *United States v. Farlee*, 757 F.3d 810, 821 (8th Cir. 2014) (cleaned up). A "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. We "[g]iv[e] 'substantial deference' to the district court's admission of . . . evidence under Rule 403 of the Federal Rules of Evidence." *United States v. Claybron*, 716 F. App'x 564, 568 (8th Cir. 2017) (per curiam) (quoting *United States v. Condon*, 720 F.3d 748, 754–55 (8th Cir. 2013)).

We conclude that the district court did not err in permitting SA Foiles's testimony about why he requested a no-knock search warrant. Croghan's counsel discussed *how* the no-knock warrant was executed in his opening statement. Based on counsel's opening statement, the government was entitled to explain *why* law enforcement requested to execute this type of warrant, which SA Foiles admitted on cross-examination is "traumatic" for the occupants. SA Foiles's testimony regarding the no-knock warrant was relevant because it afforded the jury a complete picture of the search of Croghan's residence and, ultimately, the discovery of the devices upon which the evidence against Croghan was found. SA Foiles's testimony was not unfairly prejudicial to Croghan because at no time did SA Foiles suggest that Croghan was dangerous or untrustworthy.

---

describing why SA Foiles requested a no-knock warrant. Croghan's failure to object to this question and testimony means that plain-error review applies. *See Zurheide*, 959 F.3d at 921. However, regardless of what standard applies, affording the district court substantial deference, we conclude that the district court did not err in permitting SA Foiles's testimony about why he requested a no-knock warrant.

-19-

B. *Sufficiency of the Evidence*

Croghan argues that insufficient evidence supported the jury's verdict convicting him of the knowing receipt of child pornography, as opposed to the lesser included offense of knowing access of child pornography. While Croghan concedes that sufficient evidence exists that he knowingly *accessed* child pornography, he argues there was no evidence that he knowingly *received* child pornography. According to Croghan, the district court conflated the concepts of access and receipt such that there is no difference between the two separate crimes.

Three separate crimes intersect in this case: possession of child pornography, receipt of child pornography, and access of child pornography. *See* 18 U.S.C. § 2252A(a)(2), (a)(5)(B). All three offenses require the defendant to have acted "knowingly." *See id.* "This element of scienter carries critical importance in the internet context given spam and the prevalence and sophistication of some computer viruses and hackers that can prey upon innocent computer users." *United States v. Pruitt*, 638 F.3d 763, 766 (11th Cir. 2011) (per curiam). The statutes' requirement that the defendant "knowingly" access, possess, or receive child pornography "eliminates the possibility that an unwitting downloader of child pornography will trigger liability under the statutes." *United States v. Woods*, 684 F.3d 1045, 1060 (11th Cir. 2012) (per curiam). "[T]he scienter requirement of [§ 2252A(a)] imposes an unforgiving standard on the government." *United States v. Tagg*, 886 F.3d 579, 589 (6th Cir. 2018). As the Fifth Circuit has observed, "[i]t can be difficult to prove the requisite knowing-receipt [of child pornography] because this requires intricate—and sometimes impossible—tracing and analysis of computer files *unless* . . . the Government happened to be operating undercover on the same peer-to-peer, internet-file-sharing network as defendant." *United States v. Ross*, 948 F.3d 243, 247 (5th Cir. 2020) (emphasis added).

Section 2252A(a)(5)(B) of 18 U.S.C. "criminalizes the knowing possession of child pornography." *United States v. Manning*, 738 F.3d 937, 945 (8th Cir. 2014). The elements of the offense are "the (1) knowing possession of . . . , (2) any print material, film, or computer media, (3) containing an image of child pornography." *United States v. Brune*, 767 F.3d 1009, 1019 (10th Cir. 2014). Because "[t]he statute does not define . . . possession[,] . . . courts have given th[e] term[] [its] plain meaning." *United States v. Ramos*, 685 F.3d 120, 131 (2d Cir. 2012). "'Possession' is '[t]he fact of having or holding property in one's power; the exercise of dominion over property.'" *United States v. Romm*, 455 F.3d 990, 999 (9th Cir. 2006) (alteration in original) (quoting Black's Law Dictionary 1183 (7th ed. 1999)). "[T]o establish possession, the government must prove a sufficient connection between the defendant and the contraband to support the inference that the defendant exercised dominion and control over it." *Id.* (cleaned up). "[C]onstructive possession of [child pornography] is established when a person has ownership, dominion or control over the [pornographic material] itself, or dominion over the premises in which the [pornographic material] is concealed." *United States v. Acosta*, 619 F.3d 956, 961 (8th Cir. 2010) (third and fourth alterations in original) (quoting *United States v. Kain*, 589 F.3d 945, 950 (8th Cir. 2009)). "Congress intended the 'possessing' *actus reus* to apply to someone who 'intentionally searched for images of child pornography, found them, and knowingly accepted them onto his computer,' even if that acceptance was merely temporary." *Tagg*, 886 F.3d at 588 (quoting *Ramos*, 685 F.3d at 132).

Although Croghan was not charged with knowing possession of child pornography, the elements of that offense are relevant to the crime for which he was convicted—receipt of child pornography. *See* 18 U.S.C. § 2252A(a)(2). Section 2252A(a)(2) makes it unlawful "to 'knowingly receive[]' 'any child pornography' that has been transported in interstate commerce 'by any means, including by computer.'" *Manning*, 738 F.3d at 945 (alteration in original) (quoting 18 U.S.C. § 2252A(a)(2)). "The statute does not define receipt"; therefore, we afford it its ordinary meaning.

-21-

*Ramos*, 685 F.3d at 131. "The ordinary meaning of 'receive' is 'to knowingly accept'; 'to take *possession* or delivery of'; or 'to take in through the mind or senses.'" *Pruitt*, 638 F.3d at 766 (emphasis added) (quoting Webster's Third New Int'l Dictionary: Unabridged 1894 (1993)).

"The convictions for receipt and possession of child pornography turn on essentially the same requirements and evidence . . . ." *United States v. Worthey*, 716 F.3d 1107, 1113 (8th Cir. 2013) (internal quotation omitted) (applying 18 U.S.C. § 2252(a)(2) and (a)(4)(B)).[7] Receiving child pornography "generally require[s] a knowing acceptance or taking possession of the prohibited item." *United States v. Schales*, 546 F.3d 965, 978 (9th Cir. 2008) (cleaned up), *cited with approval in Muhlenbruch*, 634 F.3d at 1003. As a result, we have held that "possession of child pornography is a lesser included offense of receiving child pornography." *Muhlenbruch*, 634 F.3d at 1003. "[P]roof of receiving child pornography under § 2252[A](a)(2) necessarily includes proof of illegal possession of child pornography under § 2252[A](a)([5])(B) . . . ." *Id.* (applying 18 U.S.C. § 2252(a)(2) and (a)(4)(B)).[8]

---

[7]*See United States v. Muhlenbruch*, 634 F.3d 987, 1003 n.6 (8th Cir. 2011) ("As the Third Circuit explained in *United States v. Miller*, 527 F.3d 54, 64 n.10 (3d Cir. 2008), '[t]he jurisprudence concerning the receipt and possession provisions of 18 U.S.C. § 2252 and the comparable provisions of 18 U.S.C. § 2252A often converges' and '[t]hese statutory provisions have been characterized as materially identical.'" (alterations in original)).

[8]While "*all receivers are possessors*[,] . . . not all possessors are receivers." *United States v. Watzman*, 486 F.3d 1004, 1010 (7th Cir. 2007) (emphasis added); *see also Miller*, 527 F.3d at 63 ("The evidence required to establish the intent-element of § 2252A(a)(2) may be greater than that required to establish the intent-element of § 2252A(a)(5)(B) because, while a person who 'knowingly receives' child pornography will necessarily 'knowingly possess' child pornography, the obverse is not the case.").

"This Court has not yet [expressly] decided whether viewing images stored in temporary internet files is sufficient to establish knowing *receipt*. . . of child pornography." *Ramos*, 685 F.3d at 131 (emphasis added).[9] However, we have recognized that

> [t]he presence of child pornography in temporary internet and orphan files on a computer's hard drive is evidence of prior *possession* of that

---

> [A] person who seeks out only adult pornography, but without his knowledge is sent a mix of adult and child pornography, will not have violated that statutory provision. That same person, however, could be in violation of the possession provision . . . if he or she decides to retain that material, thereby knowingly possessing it.

*United States v. Myers*, 355 F.3d 1040, 1042 (7th Cir. 2004). In addition, "a person who created an image [of child pornography] or found it in trash could 'possess' child pornography without ever receiving it." *Watzman*, 486 F.3d at 1009 (citing *United States v. Malik*, 385 F.3d 758, 759 (7th Cir. 2004)).

[9] *United States v. Stulock*, 308 F.3d 922 (8th Cir. 2002), did not hold otherwise. *Stulock* involved our review of the defendant's sentence after he was convicted for knowingly receiving child pornography. *Id.* at 923–24. In reciting the procedural history of the case, we noted in addition to the receipt charge, a bench trial was held on the charge of knowingly possessing child pornography, but that the district court acquitted the defendant of the charge. *Id.* at 925. "The district court explained that one cannot be guilty of possession for simply having viewed an image on a web site, thereby causing the image to be automatically stored in the browser's cache, without having purposely saved or downloaded the image." *Id.* We were not asked to address the legal correctness of the district court's conclusion; therefore, the decision cannot be read as our holding that viewing an image on a website is insufficient to constitute the knowing possession of child pornography. Nor can our cases citing *Stulock* be read to reach such a holding. *See Worthey*, 716 F.3d at 1113 (merely pointing out that the government adduced more evidence than just images found in a browser cache (as in *Stulock*) to sustain the defendant's convictions for receiving and possessing child pornography).

pornography, though of course it is not conclusive evidence of knowing possession and control of the images, just as mere presence in a car from which the police recover contraband does not, without more, establish actual or constructi[ve] possession of the contraband by a passenger.

*Kain*, 589 F.3d at 950 (finding sufficient evidence of knowing possession where defendant's browsing history showed repeated accessing of child pornography websites); *see also United States v. Huyck*, 849 F.3d 432, 443 (8th Cir. 2017) ("[T]hough the ninety-five thumbnail images on the Hitachi hard drive were not viewable without special software, they nonetheless constituted evidence of prior possession of child pornography."). And, our sister circuits "have upheld child pornography receipt and possession convictions where a defendant viewed child pornography stored in temporary internet files on a computer." *Ramos*, 685 F.3d at 131 (citing *Pruitt*, 638 F.3d at 766–67; *Kain*, 589 F.3d at 948–50; *Romm*, 455 F.3d at 998, 1002; *United States v. Bass*, 411 F.3d 1198, 1201–02 (10th Cir. 2005)).

"A person 'knowingly receives' child pornography under 18 U.S.C. § 2252A(a)(2) when he *intentionally views*, acquires, or accepts child pornography on a computer from an outside source." *Pruitt*, 638 F.3d at 766 (emphasis added). "[A]n intentional viewer of child-pornography images sent to his computer may be convicted whether or not, for example, he acts to save the images to a hard drive, to edit them, or otherwise to exert more control over them." *Id.* (citing *Romm*, 455 F.3d at 998 (finding sufficient for "receiv[ing]" under § 2252A that "Romm exercised dominion and control over the images in his cache by enlarging them on his screen, and saving them there for five minutes before deleting them")). "Evidence that a person has sought out—searched for—child pornography on the internet and has a computer containing child-pornography images—whether in the hard drive, cache, or unallocated spaces—can count as circumstantial evidence that a person has 'knowingly receive[d]' child pornography." *Id.* (alteration in original); *see also id.* at 767 (upholding defendant's conviction where "investigators found a record of

internet searches using terms related to child pornography . . . and a record of visits to websites with a child-pornography connection").

The Second Circuit has held that sufficient evidence supported a defendant's conviction for knowingly receiving and possessing child pornography "even assuming he viewed the images in question only in temporary internet files and did not save them onto his hard drive." *Ramos*, 685 F.3d at 131.[10] First, the court explained, the defendant "clearly 'receive[d]' and 'possesse[d]' the images, even though they were only in his temporary internet files." *Id.* (alterations in original). The evidence showed that the defendant

> had some control over the images even without saving them—he could view them on his screen, he could leave them on his screen for as long as he kept his computer on, he could copy and attach them to an email and send them to someone, he could print them, and he could (with the right software) move the images from a cached file to other files and then view or manipulate them off-line.

*Id.* at 131–32 (citing *Romm*, 455 F.3d at 998 (relying on witness's testimony as to what could be done with cached files); *United States v. Tucker*, 305 F.3d 1193, 1204–05 (10th Cir. 2002) (same)). In total, "the evidence showed [that] an individual who views images on the internet accepts them onto his computer, and he can still exercise dominion and control over them, even though they are in cache files. In other words, he receives and possesses them." *Id.* at 132. Second, the court found "ample evidence that [the defendant] intentionally searched for images of child pornography, found them, and knowingly accepted them onto his computer, albeit temporarily." *Id.* The defendant's "browsing history on his desktop computer showed that [he]

---

[10]*Ramos* concerned the July 27, 2006 to October 7, 2008 version of 18 U.S.C. § 2252A. 685 F.3d at 130. It did not concern Congress's October 8, 2008 amendment of § 2252A(a)(5)(B), which added the words "or knowingly accesses with intent to view." *Id.* at 130 n.7.

intentionally searched for child pornography on the internet" and "viewed some 140 images of child pornography, which were stored on the computer in temporary internet files." *Id.*

Croghan was charged with knowingly *receiving* child pornography *and* with knowingly *accessing* child pornography. The jury did not return a verdict on the access count in accordance with the district court's instructions. Section 2252A(a)(5)(B) prohibits "knowingly access[ing] with intent to view, any . . . computer disk, or any other material that contains an image of child pornography." In 2008, Congress added the "knowingly access" language "to make clear that accessing child pornography to view it was proscribed." *Ramos*, 685 F.3d at 130 n.7 (citing Enhancing the Effective Child Pornography Prosecution Act of 2007, Pub. L. No. 110–358, § 203(b), 122 Stat. 4001, 4003 (2008)).

According to Croghan, the government proved, at most, that he knowingly accessed child pornography. *See* Appellant's Br. at 22 ("The evidence at trial tended to show that Mr. Croghan *accessed* child pornography on Playpen, but it did not prove that he *received* (took custody of) child pornography.") He requests that this court "remand for entry of judgment on the lesser-included accessing offense." Appellant's Reply Br. at 4 n.1 (citation omitted). Croghan, however, misunderstands the elements necessary to sustain a conviction for the access-with-intent offense and how those elements compare to the receipt offense.

To sustain a conviction under § 2252A(a)(5)(B), the government must prove beyond a reasonable doubt that the defendant "(1) . . . knowingly access[ed] *some* proscribed material; (2) . . . intend[ed] to view that material; and (3) . . . kn[ew] that the material contain[ed] an image of child pornography."*Brune*, 767 F.3d at 1020. The government need not "show[] that [the defendant] actually viewed illegal content on the site. The access-with-intent offense is complete the moment that the elements of access and intent coincide." *Tagg*, 886 F.3d at 587. In other words, "knowingly

-26-

accessing a child-pornography website with the intent to view illegal materials is itself a criminal act." *Id.* "This is the most natural reading of the statute." *Id.* at 588. "Grammatically, the word 'accesses' (the *actus reus* of the crime) is directed towards the repository containing child pornography, not the child pornography itself." *Id.* By contrast, "[t]he person who completes the circle and views the image has, instead, committed the *actus reus* of possession." *Id.* "'[A]ccess-with-intent' liability is triggered when a person 'intentionally searche[s] for images of child pornography, f[inds] them,' but then stops short of viewing the images themselves." *Id.* (second and third alterations in original) (quoting *Ramos*, 685 F.3d at 132); *see also United States v. DeFoggi*, 839 F.3d 701, 711–12 (8th Cir. 2016).

Our cases have been viewed as "implicitly tak[ing] this broad view of the criminal liability provision of [§ 2252A(a)]." *Tagg*, 886 F.3d at 588 (citing *DeFoggi*, 839 F.3d at 711–12; *Huyck*, 849 F.3d at 442–43). In *Huyck*, the defendant was first convicted of receipt or attempted receipt of child pornography, in violation of § 2252A(a)(2), and access with intent to view child pornography, in violation of § 2252A(a)(5), based on his use of the Tor network to access Pedoboard, a hidden website "strictly devoted to child pornography." 849 F.3d at 436. We held that "[t]he evidence presented at trial demonstrated that [the defendant] received and accessed with intent to view child pornography from Pedoboard." *Id.* at 442. First, "[t]he NIT linked [the defendant's] IP address to the November 21, 2012 access to Pedoboard." *Id.* Second, the defendant "was the only adult living at his residence." *Id.* Third, the defendant admitted to police that he had used the Tor network. *Id.* Fourth, the defendant "saved text files on his computer detailing instructions on how to access the Tor network along with links to . . . another hidden child pornography website on the Tor network." *Id.* Without "discuss[ing] whether or not the government offered proof that [the defendant] had ever accessed images from th[e] website," *Tagg*, 886 F.3d at 588, we concluded that this evidence "demonstrat[ed] his knowledge and intent to use the Tor network to receive and access child pornography." *Huyck*, 849 F.3d at 442.

In summary, the access-with-intent offense is not synonymous with the receipt offense: the former requires only an *intent* to view, while the latter requires "intentionally view[ing], acquir[ing], or accept[ing] child pornography on a computer from an outside source." *Pruitt*, 638 F.3d at 766.[11] We hold that the government presented sufficient evidence that Croghan intentionally viewed child pornography.

First, the government produced ample evidence of Croghan's *knowing* receipt of child pornography through evidence about its undercover operation of Playpen, a Tor hidden service website. *See Ross*, 948 F.3d at 247.[12] Croghan had the Tor network on his computer. The NIT linked Croghan's IP address to the Playpen user account of Beau2358. Open-source internet searches and employment information confirmed that Beau2358 was Croghan; in addition, a search confirmed that Croghan had previously uploaded five images on PrimeJailbait.com, which bore a similar name to the Jail Bait section of Playpen. Croghan logged into his Playpen user account and searched 51 topics during the two-week period that the FBI controlled Playpen.

---

[11]Had the government prosecuted Croghan only for the access-with-intent offense, it would have had more than sufficient evidence. This is because it produced evidence that Croghan did not just intend to view the child pornography, but actually viewed the pornography.

[12]Ample evidence of Croghan's intent is what distinguishes his case from *United States v. Dobbs*, 629 F.3d 1199 (10th Cir. 2011). In that case, "little doubt [existed] that [the defendant]—or at least his computer—'received' child pornography." *Id.* at 1204. The defendant did "not contest that the government found images of child pornography on his computer." *Id.* Instead, the defendant "challenge[d] the sufficiency of the government's evidence establishing that he knowingly received the two images." *Id.* (emphasis omitted). The Tenth Circuit concluded that "[t]he government presented no evidence that [the defendant] actually saw the two images on his monitor, such that he would have had the ability to exercise control over them." *Id.* at 1207. Croghan's case is the converse of *Dobbs*: Croghan concedes that he viewed child pornography but argues that he did not "receive" it because no child pornography was found on his computer.

Croghan had to take several steps to view child pornography on Playpen: log into Playpen with a user name and password, navigate to one of the various sub forums, and click on a post. The "images were embedded within that post"; therefore, when Croghan clicked on the post, the full-sized images "would have been downloaded to [his] computer and displayed on the computer screen without additional action being taken." Trial Tr., Vol. II, at 111.

Second, the government produced sufficient evidence that Croghan *received* child pornography. The government was not required to prove that Croghan saved the images to his hard drive to sustain a conviction for receipt. *See Pruitt*, 638 F.3d at 766–67; *Ramos*, 685 F.3d at 131. Instead, the government's evidence that Croghan viewed the images is sufficient in the present case to prove receipt. *See Ramos*, 685 F.3d at 131. SA Alfin confirmed that Beau2358 "accessed" or "looked at" several different sections of Playpen: Preteen HardCore, Infants and Toddlers, Incest, and Jail Bait. Trial Tr., Vol. II, at 121. SA Alfin testified that, for example, "Beau2358 went into the Pre-teen hard core section" and "clicked on a topic." *Id.* at 113. SA Alfin confirmed that Beau2358 "received . . . child pornography" once he "click[ed] on to the next screen" where the "first image c[ame] up or a group of images." *Id.* "[A]ll of the images in the posting [were] downloaded to [Beau2358's] computer over the Internet." *Id.* at 114; *see also id.* at 142 (confirming that once a user "click[s] on an image and view[s] it, [the user has] received it," "whether or not [the user] save[s] a copy to look at later"). These images "depict[ed] prepubescent children engaged in sexual activity." *Id.* at 114. As in *Ramos*, the evidence showed that Croghan "had some control over the images even without saving them," such as "view[ing] them on his screen" or "leav[ing] them on his screen for as long as he kept his computer on." 685 F.3d at 131.

And, as in *Ramos*, "there was ample evidence that [Croghan] intentionally searched for images of child pornography, found them, and knowingly accepted them

onto his computer, albeit temporarily." *Id.* at 132. In addition to SA Alfin's testimony detailing what Croghan looked at on Playpen, Trooper Haugaard testified that Croghan's recent history included video file names of child pornography. And, Trooper Haugaard located a "bookmark" or "quick reference guide" in the computer's browser under Croghan's user name for a Russian website containing child exploitation material. Trial Tr., Vol. II, at 251. Trooger Haugaard confirmed locating "child pornography artifacts" on Croghan's computer. *Id.* at 276.

Accordingly, we hold that sufficient evidence supports Croghan's conviction for receipt of child pornography.[13]

## C. *Sentence*

Finally, Croghan challenges his below-Guidelines sentence of 110 months' imprisonment as substantively unreasonable.

The PSR calculated a Guidelines range of 135 to 168 months' imprisonment. At sentencing, neither party objected to this calculation. The district court adopted the PSR's recommended Guidelines range. The court noted that Croghan would not receive a decrease for acceptance of responsibility because he did not plead guilty. The government recommended a Guidelines sentence, but Croghan's counsel requested a sentence of no more than 80 months' imprisonment. Counsel compared Croghan and Steven Horton, another defendant identified in the Playpen investigation. Unlike Croghan, Horton had pleaded guilty to knowingly accessing child pornography. According to Croghan's counsel, Croghan had a "substantially higher" Guidelines range than Horton even though "the conduct is exactly the same" and "Croghan would have accessed less than [Horton]." Sent'g Tr. at 12, *United*

---

[13]Because we hold that sufficient evidence exists to support Croghan's conviction for receipt of child pornography, we need not address attempted receipt or what, if any, differences exist between it and the access-with-intent offense.

*States v. Croghan*, No. 1:15-cr-00048-SMR-HCA-1 (S.D. Iowa Dec. 6, 2018), ECF No. 130. Counsel argued that just because Horton pleaded guilty and Croghan went to trial "d[id not] justify a sentence five levels higher." *Id.*

The court sentenced Croghan to a below-Guidelines sentence of 110 months' imprisonment. In imposing Croghan's sentence, the district court expressly stated that it had "considered all of the factors under [§] 3553(a) and . . . the advisory guidelines and the statutory penalties." *Id.* at 14. The court discussed Croghan's offense conduct and Croghan's history and characteristics, including his upbringing, marriage and children, and minor criminal history. Then, the court discussed the potential sentencing disparity between Croghan and Horton that Croghan's counsel had raised. The court emphasized the contrasting posture of the defendants at their respective sentencings. Croghan went to trial on a more serious charge, while Horton pleaded guilty to a lesser charge. The court discussed the ramifications of the distinction. It also discussed the impact of child-pornography cases on the courtroom participants.[14] The court acknowledged that Croghan was "absolutely entitled to have a trial," but explained that Croghan was "not entitled to the significant benefit that anybody who prevents that trauma from happening is entitled to receive for having pled guilty." *Id.*

---

[14]Specifically, the district court commented that

trial isn't an easy thing in these child pornography cases. A defendant who chooses to plead guilty in a child pornography case saves 14 jurors from looking at images of children being raped, saves marshals and court security officers and court reporters and courtroom deputies and lawyers from having to look at images of children being raped, defense attorneys from having to look at children being raped. There is traumatic injury that happens surrounding these kinds of trials.

*Id.* at 16.

at 16. As a result, the court stated that it could not "give [Croghan] a sentence that's lower than what [it] gave to Mr. Horton, who did plead guilty." *Id.*

Croghan argues that the district court imposed an unreasonable sentence that punished him severely for exercising his constitutional right to a jury trial and improperly considered the burden imposed on participants in a child pornography trial. The deferential abuse-of-discretion standard applies to a district court's sentencing decision. *See United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc). "A district court abuses its discretion when it . . . gives significant weight to an improper or irrelevant factor . . . ." *Id.* (internal quotation omitted). "While substantive review exists, in substantial part, to correct sentences that are based on unreasonable weighing decisions, this court must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *United States v. Webster*, 820 F.3d 944, 945 (8th Cir. 2016) (per curiam) (cleaned up). "[W]hen a district court has sentenced a defendant below the advisory [G]uidelines range, it is nearly inconceivable that the court abused its discretion in not varying downward still further." *United States v. Merrell*, 842 F.3d 577, 585 (8th Cir. 2016) (internal quotation omitted).

In support of his argument that the district court penalized him for proceeding to trial, Croghan cites *United States v. Hernandez*, 894 F.3d 1104 (9th Cir. 2018), and *United States v. Sales*, 725 F.2d 458 (8th Cir. 1984). In *Hernandez*, the Ninth Circuit remanded to the district court for further explanation of the defendant's sentence "because the district court appear[ed] to have increased [the defendant's] sentence or withheld a reduction for acceptance of responsibility based on [the defendant's] decision to go to trial." 894 F.3d at 1109. During the sentencing hearing, the district court had "emphasized [the defendant's] decision to go to trial five separate times." *Id.* at 1110. "Critically . . . , the district court's comments regarding [the defendant's] decision to go to trial comprised *virtually the entirety of the explanation for the*

*sentence.*" *Id.* at 1111 (emphasis added). The Ninth Circuit noted that "the court *did not reference* any particular 'facts of this case' or 'particular record' beyond [the defendant's] exercise of his constitutional rights." *Id.* (emphasis added) (quoting *United States v. Ramos-Medina*, 706 F.3d 932, 941–42 (9th Cir. 2013)). Instead, it "made a passing reference to the 18 U.S.C. § 3553(a) sentencing factors." *Id.* According to the Ninth Circuit, "this boiler-plate statement immediately after chastising [the defendant] for going to trial, and *without any explanation*, [did] not cure the infirmities in the district court's justification for the sentence imposed." *Id.* The district court failed to "specify which factors it considered," explain how it "may have applied the factors to the facts of [the defendant's] case," or state "whether it considered any facts at all beyond [the defendant's] decision to exercise his constitutional rights." *Id.* The Ninth Circuit concluded:

> *Enhancing a sentence solely because a defendant chooses to go to trial* risks chilling future criminal defendants from exercising their constitutional rights. And imposing a penalty for asserting a constitutional right heightens the risk that future defendants will plead guilty not to accept responsibility, but to escape the sentencing court's wrath.

*Id.* at 1112 (emphasis added).

In *Sales*, we vacated a defendant's judgment of conviction on nine counts but affirmed the defendant's judgment of conviction on one count. 725 F.2d at 460. In remanding for resentencing, we "express[ed] concern as to the [district] court's apparent motivation for the imposition of defendant's original sentences" because, at the original sentencing, the district "court was openly critical of the defendant for not plea bargaining and for going to trial 'for three days with a jury on all ten counts' in light of the substantial evidence against the defendant." *Id.* The district court's total sentence of 55 years' imprisonment was "[e]xplicitly in response to what

-33-

the district court viewed as an abuse of the judicial process." *Id.* The district court's "method of sentencing and . . . remarks suggest[ed] an absence of the proper exercise of judicial discretion in the sentencing process." *Id.* While we recognized that "no one should abuse" his constitutional right to defend himself "by causing needless delay or otherwise hindering the judicial process," our primary concern was "safeguard[ing] a defendant's right to a full and fair trial. A court may not use the sentencing process to punish a defendant, notwithstanding his guilt, for exercising his right to receive a full and fair trial." *Id.*

Croghan's case differs materially from *Hernandez* and *Sales* for several reasons. First, unlike in *Hernandez* and *Sales* where the district courts appeared to have *increased* the defendants' sentences because they exercised their trial rights, the district court here imposed a below-Guidelines sentence.

Second, the district courts in *Hernandez* and *Sales* tied their sentences to the defendants' decision to go to trial without referencing the particular facts of the defendants' cases. By contrast, the district court here not only stated that it had considered all of the § 3553(a) factors but also discussed some factors, including Croghan's offense, his criminal history, and his personal characteristics.

Third, the district court's comparison of Horton's and Croghan's cases was in direct response to defense counsel arguing for a more lenient sentence for Croghan based on the two defendants' offense conduct. The district court explained that Horton's lesser sentence was on account of him pleading guilty to a lesser offense, while Croghan chose to go to trial on an offense with a potentially greater penalty. The record as a whole shows Croghan's sentence resulted from appropriate consideration of the charges, the facts, and the relevant sentencing factors required by law. The court's brief comments about child-pornography trial consequences to courtroom participants did not drive the sentence. The district court acknowledged

that Croghan was "absolutely entitled to have a trial," but it correctly recognized that Croghan was not entitled to "a sentence that's lower than what [the court] gave Mr. Horton, who did plead guilty." Sent'g Tr. at 16; *see* U.S.S.G. § 3E1.1, cmt. n.2 (stating that the downward adjustment for acceptance of responsibility "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse").

As a result, we hold that the district court did not abuse its discretion in sentencing Croghan to the below-Guidelines sentence of 110 months' imprisonment.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____